23, 589 Davis-Guider v. City of Troy, et al. Mr. Rodriguez. Welcome back. Good morning again, your honors. Thank you. Max Rodriguez for the appellant Michael Davis-Guider, who I will refer to as Mr. Davis for shortness, and I'll reserve, again, three minutes for rebuttal. So your honor, in this case, the district court committed error by granting summary judgment on the merits when there were a litany of disputed questions of material fact in the record that the court chose to weigh in the defendant's favor rather than acknowledging them, weighing them in the plaintiff's favor, and allowing them to proceed to a trial. And in this case, you know, Mr. Davis woke up to a tragedy. He found the girl known in this case as VD, his partner's two-year-old daughter that he loved as his own, unresponsive. He did all the things that an adult who cared for that child would do in that situation. He tried furtively to perform CPR. He tried to find a phone to call 911, and he was doing everything he could in such an awful situation. Sadly, VD passed away. And in the wake of this first tragedy, the defendants in this case created another by deciding that Mr. Davis was guilty and setting to work cobbling together whatever incredulous, inconsistent, and false evidence they could to get to an indictment. That evidence is numerous, and we've gone through that in our briefs, but it includes most prominently a fabricated timeline in a report by Officer Kunrat, various claims both in reports to the prosecutors and testimony by Detective Fountain that were rebutted by photographs and by competing testimony, as well as an autopsy and a homicide conclusion with glaring inconsistencies and omissions by the medical examiner, Mr. Sikoreka. So can I ask you to specify what your evidence of fabrication is? Because some of the things you just described struck me as conflicting evidence, that there were conflicts in the timeline, conflicts in the testimony of the doctors and things like that. But that seems different than what's required for fabrication, so if you could spell that out. Yes. So thank you for the question. So I think fundamentally that turns on how literal are we using the term fabrication, and I think there are precedents to comfortably say that fabrication is not exclusively the concept of writing something in someone else's name. And I would point to the Morse case from this court, which said that false statements or omissions that are made knowingly constitute fabrication. And so in this context, for example, if we were to look at the officer Kuhnrath statement in the report, she on the one hand says that he said he woke up at a certain time, I believe it was 11 a.m., and that he said time must be flying because at that point, several hours had passed from when she claimed he said he had woken up. And Mr. Davis testified that he did not say that to her and that he said he didn't know what time it was, which is obviously materially distinct. And if she said that, said that he said that in a report, that is a false statement. I guess, yeah, if I could just take that one. How do you, what's the basis for saying that that was a statement by Officer Kuhnrath that was knowingly false? So let's just leave out the fabrication part, just knowingly not true versus they had a difference of memory and they're inconsistent. Well, I think in the specific context, she's writing a report contemporaneously with having spoken to him. She was the first officer to report on the scene that I believe that report was one of the first pieces of evidence that was ultimately used in the investigation in the case against him. I think to say that there would be no question of fact with respect to whether she knew what he said when he said it, I think would be a step too far with respect to summary judgment. And so then the question would be, is there a version of that dispute viewed in the favorable light to the plaintiff where he could prove at trial that she knew that? And I think, and I think he could. What, what is the, I have trouble getting my head around why the, whatever those differences are in timeline matter in any way. I mean, I just don't see it. And so I'm trying to figure out where that instinct goes. I mean, it can't be that any discrepancy between, you know, in a timeline, for example, leads to a jury trial on fabrication, right? There has to be that, that some discrepancy matters in some material way, doesn't it? That's right, Your Honor. And I think, I think there's something of, I think there's something of an obfuscation caused by the fact that Officer Kunrat was the first on the scene and intuitively that's kind of considered to be low stakes, but ultimately the record reflects that she appeared to testify at trial to this point. And I think part of the reason for that was to both marshal a narrative and rebut the defense case that this was a loving man who responded as rapidly as he could when he found this child. It was in fact the opposite that they were trying to demonstrate, which was to basically paint him as someone that was indifferent to the child, potentially actively harming the child and to undercut the impression of him in front of the jury. So I don't think it's simply some immaterial point that we're nitpicking. I think it sort of gets to the heart of the, frankly, pretty paltry evidence that they attempted to put together to convict him and ultimately failed. He was acquitted. Well, once again, I have a problem. I, well, if you finish your point, because I finished my point and I'm welcome to have more problems. The only question I have here is why was the, it seems to me that you make a great deal out of the fact that there was a CPR by the emergency technicians who came and so forth and that they, the autopsy report did not, did not really account for that. And, but he, the autopsy report does, does say, and I guess the Dr. Sicarico also said that he was aware of the CPR, but perhaps not the extent of it to some extent. Is that, is that, is that, is that fair? Yeah. So the record, the record demons, the record demonstrates that Sicarico did not meaningfully investigate the nature and extent of the CPR by EMS. No, I think, but wouldn't he, wouldn't he reasonably be entitled to reach an assumption that professionals were operate, were operating in their usual manner, that they weren't going to be using CPR that was somehow different in this case from every other case that they had, because he, he's a very experienced doctor. And so he knew CPR was being done, but he also knew that CPR was located higher in the body than the liver. And that, but that he'd see this video and the video indicated from your client how the, how the client did his CPR, which was different, which was, he was holding the baby under, the child underneath and he was pushing down on the abdomen. And that that is what must have caused the, caused the huge injury to the, to the liver that occurred. And why would the doctor have necessarily needed to ascribe that result to what happened afterwards by the EMT people? Well, because for, for a couple of reasons, because I say that my time is over, but I'll answer your question. So for a couple of reasons, because first of all, Sigiriga was drawing conclusions with respect to not just the laceration of the liver, but also the time of death and the, what could be inferred with respect to the defendant's culpability, the, the, with Mr. Davis's culpability, as well as the timeline around VD's death, because of the amount of blood that had collected in the abdomen. To the extent you are drawing that inference, but glaringly omitting because you didn't investigate it and didn't look into it at all and aren't, and meaningfully haven't refused to consider it, that they did 6,000 chest compressions, some of which were improper. I think that would raise a substantial question of fact that a jury could weigh to determine whether he was shading to get the officers where they needed to go. And I think the critical context there is that the record demonstrates that detective Fountain testified that there was no probable cause until there was a homicide conclusion from Sigiriga. He was the linchpin of turning this case from a furtive investigation into an indictment and a trial, and he got where he needed to go. Normally, I know you're over your time, but normally the CPR in question by the EMTs would not have caused this amount of bleeding under normal circumstances. But that there was this injury to the liver, which, and blood was just pouring into the abdomen and abdominal cavity from the liver, which doesn't have an encase, encasement around it. And so, if that injury, that made, I mean, what could he have come up with in terms of the EMT compressions? I'm sorry, what could he have come up with? What might he have found had he looked into it that you think would have changed things? With respect to the method in which the CPR was performed at the site in the apartment, if he had simply asked them, how did you perform it and where did you perform it, he would have seen the same thing that Mr. Davis testified to in his deposition because he saw it, which was they were pounding on her very hard when a medical expert testified that you're supposed to be substantially more gentle and not use your entire hand. And in addition to that, he would have gotten the total number. And so that would have accounted for an alternative explanation for the blood pooling that would not have been consistent with homicide. And I think by the point that you're drawing inferences that certain facts that you're selectively picking result in a homicide conclusion, and you've omitted all the ones that you've omitted or failed to meaningfully consider, all the ones that would get in the other direction, I think that gets Mr. Davis where he needs to go to say that it's up to a jury to weigh that and decide, was that some innocent hiccup that wouldn't satisfy the knowing requirement or would it? Well, it wouldn't be just that, right? It would be, it would be, was it merely negligent or was it deliberate? Precisely. And I think, but I think if you and I are having a discussion about this, I think that sort of demonstrates that it's up to the fact finder. Okay. Thank you, counsel. You've reserved some time for rebuttal. We'll hear from the appellees and Ms. Gifford, I think, first. Good morning, again. I rise on behalf of the city of Troy defendants in this matter. I think touching on the issue of the statement that Officer Kunrad had in her report, I think it's important to note that the defendant or Mr. Davis's girlfriend, Ms. Parker, the mother of the child, the next day or a few days after the incident stated that Mr. Davis told her that he thought he may have woke up at 11 or 12, but he wasn't sure because there weren't any clocks, which is very similar as to what Detective Fountain said was stated to him. And I think that touches on as far as this statement of falsification as opposed to a misremembering or just a dispute about what occurred between what she thought she heard or that as opposed to a falsification of the statement. And the court, I think correctly, the lower court correctly acknowledged that the falsification is undermined by those statements that are very similar to what Officer Kunrad had reported and what she heard. Undermine sounds like a factual dispute. Undermine, I mean, the kinds of arguments you just made sound like perfectly good arguments to the jury. I think the issue is that when there is just a after the fact assertion by the plaintiff in order to create a question of fact, the context of the evidence available for the summary judgment stage needs to be looked into. And I think the fact that all of this defeats his one statement in an attempt to defeat summary judgment, it doesn't create a question of fact at this time. It's just self-serving. And at this point, if it was maybe a question, if it was just him and her having a dispute over what occurred and it was material as far as the investigation, then potentially a question of fact would rise, but we have all this additional evidence that establishes that it was not falsified in that sense based upon that information, which turns on the falsification aspect of it with the intention. And then as far as Defendant Fountain's grand jury testimony, I believe the lower court's decision should be affirmed as far as the finding of absolute immunity. In that context, the opposition, or reply brief, acknowledges essentially that all of the statements were made before the grand jury and that he tries to dispute it or move around it by saying he must have at some point said it to the police and it must be inferred that there, or the prosecutor must be inferred that it was outside the context of the grand jury assertion, and that's really what comes down to conjecture or surmise. In any event, it would be preparation for the grand jury, which is also immunized, right? Correct, yes. And even if you did turn to the merits of what was said during the grand jury testimony, the aspect of it cannot be said to be falsified. Again, the opinion about the bed, for example, that was one of the major components of the argument is that Defendant Fountain said it was a neat, the bed was neat, and it was put together and made up. If you look at the picture at 1794 of the appendix, that observation is plainly clear from what his opinion was and what he was seeing, and that comes down to the opinion of what he's looking at. It's not a falsification of evidence when it's his opinion on what it is being seen in the picture, and that's available. It's not a false avenue, which they claim. And then similarly with BD not feeling well, those statements were also stated by Ms. Parker that she was very sluggish, that she just attributed it to it being early in the morning. She assumed she was slow to go because it was early in the morning, and that infers that because it's early in the morning, and she assumed that she was tired for that reason, that it wasn't an abnormal occurrence that morning from what occurred. So what Defendant Fountain testified before the grand jury is aligned and is not falsification of evidence. There has to be a line between what is being said that you disagree with and what can be claimed to be blatant, intentional falsification of evidence in violation of a constitutional right. And I don't believe any of the statements that the petitioner points to support that argument of falsification. And I see my time is up. Your time is up, but I wanted you to address Sikorica's case against Sikorica. Mainly it occurred to me, as I may have indicated in my questioning earlier, that Sikorica didn't account for, it didn't really matter whether he accounted for the EMT CPRs because that was routine and he knew what those were going to be like and that they weren't going to interfere with, they wouldn't cause the liver issue, the lacerations of the liver, and that that would have to be caused by something else in his opinion that the plaintiff was responsible for the liver lacerations was, you know, understandable and maybe any omission was negligent. But there's another question here. It may be that the EMTs were conducted in the normal way, but if the EMTs, the CPRs are conducted in the normal way, and there's also a liver laceration, might that not be a causative, have a causative impact on the ultimate result of all the blood appearing in the abdomen? In other words, by pressing up in the upper chest, you're affecting blood flow generally and causing more blood to come through the liver. Michael Gunsel here, Ms. Peck, actually will be addressing the county's defense, but in my opinion, from what my officers were acting under the impression of and what they were aware of, is only what Dr. Sikorica provided to them. Yeah, I understand. Okay, so when it gets to Sikorica, we'll look at the actual, his decisions, we'll look at separately. Correct, yes. All right, that's fine. Thank you, Counselor. Why don't we hear from Ms. Peck then? Good morning, Your Honors. My name is Crystal Peck. I represent the Rensselaer County and its medical examiner, Dr. Michael Sikorica. Just to address Your Honor's question, so Dr. Sikorica's testimony has been, and it's CPR performed by the EMTs, even if it was prolonged CPR provided by the EMTs, which is assumed when you have a child death, that in his experience, he has never seen CPR performed by trained professionals to result in this type, this extent of injuries. Extent of injury in the sense of the damage to the liver, but let's assume just hypothetically that there were, and maybe not, maybe it's reality, that there were really two causes of the ultimate loss of blood was what was a problem here, it seems to me, many milliliters of blood in the abdomen cavity. But here you have a combination of two different forces on the child. First is the injury that Sikorica believed was caused by the plaintiff and the last five lacerations of the liver, which led to extensive bleeding from the liver. And then the possibility that there was exacerbation of the loss of blood afterwards by all the CPR that was done by the EMT people. In other words, maybe if the second hadn't occurred, there would have been much less blood in the liver. The fact that it did occur may have caused more blood in the liver and therefore contributed. He didn't account for that in his report. I think that Your Honor's question speaks to what I think, what I see as the most significant problem in this case, and that is that what the appellant wants to do and is asking this court to do is to base 1983 civil rights liability and exposure on what amounts to a medical examiner's interpretation of the medical data and the investigation materials before them. Medical examiners, at least in New York State, are governed by County Law 674. That statute, it's more than what you would expect at a doctor at a hospital. This statute has investigative abilities that govern their jobs, which means that they are looking at both what's provided to them by the police department or any other providers. In this case, it would have been pediatric records, medical tests, discussions with the police officers, reviewing confessions or reviewing videos, things of that nature, and then taking a look at all of that along with the medical data and making an interpretation of that data. So I'm with you and agree with all of that. The one fact that gives me trouble, and it's just right on what you just said, is the pre-judgment point. So we've got the statement from, I forget which officer, saying that Dr. Sirica said, it's going to be a homicide. I just can't. I need to wait for the lab reports to come back. The inference is all in favor of the non-moving party. The contention, as I understand it, is that the doctor didn't do what you just said he's required to do and that he pre-judged and was going to decide homicide sort of no matter what. And is that enough to create a genuine issue as to falsification? But he actually did do what I said he did. So what happened is there was an initial discussion, and there was an initial review, and there was an autopsy. And he's looking at the autopsy, and he's seeing these injuries. And he knows, which he's testified to, and it's in the record, that these injuries are far exceed what he would see from typical EMT, trained EMTs doing CPR. He doesn't issue his autopsy report then. He waits. He gets the medical tests come in. He looks at the pediatric records. He evaluates everything. And only after all of that information comes in, is there an autopsy report that's issued with a cause of death determination. But he said before he sees that that he's going to conclude it's a homicide. He looks at the medical evidence that he sees in the autopsy, and he's seeing that it looks like a homicide. And a homicide just means a death caused at the hands of someone else. It doesn't necessarily point to Davis or any individual. It's just a death caused by the hands of someone else. And in this case, the medical evidence that he looked at when he opened up this child indicated to him that this was far beyond what you would see in a CPR situation. And that's the initial, the initial inclination is based on that autopsy, is based on the medical evidence in front of him. But he doesn't finalize that until everything comes in. And I think that's very important. The indictment follows the autopsy report. The indictment does follow the autopsy report. Yes, the issued report. Yes. All the evidence is there before the indictment is handed down. Exactly. Is there probable cause without the autopsy report? The officers say no, right? The officers say no. The district attorney, which was a part of this case, was eventually stipulated out, didn't rely on the autopsy report. I'm not going to sugarcoat that. He absolutely relied on the autopsy report. But the autopsy report is based, and the cause of death determination is based on interpretation of medical data and investigation materials. 1983 liability, you won't find it for just a negligent police investigation, straight up negligent police investigation. And it's the same way you're not going to find it for, I'm not conceding that there was any negligence here. But it's the same way that 1983 liability couldn't be premised on a negligent medical determination. And it's why there's qualified immunity in these cases. Because otherwise, what you'll have is medical examiners that are too nervous and too afraid to issue a cause of death determination. Or you're going to open up every criminal case where there's an acquittal and there's a cause of death determination. There's significant ramifications here. Well, the other question that occurred to me, that was just to the point of the fact that there were some tests that hadn't been received. And so a statement was made, homicide, at that point. But the tests obviously didn't affect the outcome because there was ultimately an indictment. And the tests were in place before there was an autopsy report. They'd been received by that time. Yes, the tests were received and reviewed, as well as the pediatric records. There was no explanation as to why this child was unresponsive. And I understand that there were medical experts presented at the criminal trial, that the appellant has a medical expert in this case. But what we're talking about, the differences in these opinions amount to an interpretation of a liver slide and the ultimate cause of death determination, which means that we are still talking about simply a difference in medical opinions. We're not talking about intentional fabrication. We're not talking about falsifying. One of the cases that was referenced, the Jergesen case, that was referenced in Appellant's brief, where you're talking about a crime lab technician, that's results were actually falsified. None of that happened here. It's just interpretation of the data. Thank you, counsel. Thank you. We'll hear rebuttal. So a few points with respect to my friend who represents the city and the officers. She referenced the fact that plaintiff's recollection is not sufficient to create a factual dispute with respect to Officer Kunrat. I would just direct the court to look at the, it's EKUKPE case, that's E-K-U-K-P-E, which is cited in my briefing, that when there's no basis to question the validity of the plaintiff's recollection, dueling recollections in this sort of context are sufficient to create a question of fact. With respect to my friend's point about the grand jury issue, it's just not an accurate representation of our argument or the record. The record demonstrates that there were meetings between the prosecutor, the officers, and at least some of those meetings also included Dr. Sikorica, in the investigative phase prior to when any preparation for the grand jury or testimony in the grand jury would have occurred, no one recalled what was said in those meetings, in depositions. And so then the question is, what was said? And is it consistent with what was ultimately said in the grand jury? The ultimate point on top of that is that the record also reflects- But you're still just pointing to the grand jury as to the evidence that you're actually asking. As illustrative, but not as the basis of the claim. The additional point I would make on that is that the same statements were also made in testimony at the trial. So that's another basis upon which those statements are outside the province of Rayburg. Unless you have any other questions on the grand jury? Not on the grand jury, but on the officers, I guess a basic problem seems to me on the false statements is that you'd still, with the autopsy report, have the prosecution, probable cause for the prosecution in the absence of the, even assuming falsity of the timeline, et cetera, wouldn't you? You mean if the- The indictment would have been procured even with- Assuming that you were to find that there wasn't anything wrong with the autopsy report? I mean, there's no allegations of the officer's involvement in the falsity of the autopsy report. Not directly in the conclusions that he asserted in the report, but they met with Dr. Sekariko multiple times. He knew the state of their case. They showed him what he had, and then he provided the, what I would submit is, the fixes in preliminary conclusion prior- Isn't that normal for the medical examiner to meet with the officers to find out what they know about it, like any doctor would about any situation, to find out what the circumstances are? No, Your Honor, that in and of itself is not unusual, but what is unusual is to selectively, to my friend's point with respect to the sweeping investigative responsibility of the medical examiner, it seems to me a conspicuous factual question that the investigation included consideration of these records, consideration of the discussion of the evidence that the officers presented, meeting with the officers, but somehow conspicuously did not include any investigation into the additional CPR that was performed. In addition to that, the homicide conclusion, as a plaintiff's medical expert testified, ran in contravention to medical examiner association guidance that said that a case like this should not be ruled a homicide. And so then the question becomes, is that exclusively just a question of sort of negligence and dueling experts, or viewed in the light most favorable to the plaintiff, could it be construed as basically willful blindness in the direction of what the result that the officers wanted that would get them the probable cause that they needed? Fundamentally, they didn't have it. They admitted they didn't have it, and they needed him. And then they got what they asked for. I think that there's a reasonable inference there that a jury could find in his favor. Thank you. We'll ask that you vacate and remand for a trial. Thank you, counsel. Thank you all. We'll take the case under advisement.